**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AAMCO TRANSMISSIONS, INC., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  11-4250 |
| FRANK WIRTH and | : | |
| AUTO CENTER, LLC, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                    December 7, 2011

　　　Currently pending before the Court is a Motion to Dismiss Defendants' Counterclaims by

Plaintiff AAMCO Transmissions, Inc. ("ATI") against Defendants Frank Wirth and Auto Center,

LLC.  For the following reasons, the Motion is granted.

## I.　　FACTUAL BACKGROUND

　　　According to the facts set forth in the Complaint, ATI has continually, since at least 1963,

used the name "AAMCO" as its trade name, trademark, and service mark in connection with the

operation of transmission repair centers.  (Compl. ¶ 6.)  It owns three marks registered on the

principal register of the United States Patent and Trademark office for "automobile repair

services": (1) the name "AAMCO"; (2) a pictorial representation containing the name

"AAMCO"; and (3) a pictorial representation containing the name "AAMCO Transmissions."

(Id.)  ATI uses the name "AAMCO" in the operation of its approximately 700 licensed or

franchised transmission repair centers.  (Id. ¶ 7.)  To preserve the good will and secondary

meanings associated with its names, ATI has established standards and policies governing the

quality of service to be provided to the public, and has established procedures calling for the inspection of franchisees' centers to determine that the standards and policies are being followed. (Id. ¶ 10.)

On February 6, 2008, ATI and Defendant Frank Wirth entered into a franchise agreement ("Franchise Agreement"), pursuant to which Wirth was authorized to use the name and mark "AAMCO" in connection with the operation of an AAMCO Transmission Center located at 2310 Walnut Street, Harrisburg, Pennsylvania (the "Center"). (Id. ¶ 11.) On that same day, Wirth executed a promissory note in favor of ATI in the amount of $21,000, which required him to make twenty-one monthly payments of $1,000 each to ATI. (Id. ¶ 12.) The parties then executed an amendment to the Franchise Agreement on August 5, 2008, adding Defendant Auto Center as a franchisee. (Id. ¶ 13.)

Two years later, in August 2010, Defendants were audited by ATI for compliance under the Franchise Agreement. (Id. ¶ 14.) Following that audit, Defendants executed a settlement agreement and promissory note in favor of ATI in the amount of $35,000, payable in thirty-five monthly installments of $1,000 each. (Id.) Via letter dated June 9, 2011, however, ATI notified Defendants that they were in breach of the Franchise Agreement and in default under the 2008 and 2010 Notes for failure to pay the sums owed. (Id. ¶ 15.) When Defendants failed to cure any of these deficiencies, ATI, by letter dated June 21, 2011, terminated the Franchise Agreement and demanded that Defendants comply with their post-termination obligations under the Franchise Agreement. (Id. ¶¶ 16-17.) Specifically, Section 19.2(a) of the Franchise Agreement required that, upon termination of the Franchise Agreement for any reason, Defendant shall:

(2)     immediately and permanently discontinue the use of all AAMCO names and

2

marks, signs, structures, all forms of advertising, telephone listings and service, manuals, software and all materials and products of any kind which are identified or associated with the System or AAMCO and return all such materials and products, including without limitation, the Operator's Manual, to AAMCO;

(3)   thereafter make no representations or statements for commercial benefit that Franchisee is or ever was in any way approved, endorsed, associated or identified with AAMCO or the System in any manner whatsoever or that Franchisee is a former AAMCO franchisee; provided, however, Franchisee shall reimburse AAMCO for all customer warranty repairs made within an applicable warranty period arising from work performed at the Center;

(4)   immediately take all steps necessary to amend or terminate any registration or filling of any fictitious name or any other registration or filing containing the AAMCO names and marks in order to effectuate the removal of the AAMCO names and marks from such registration or filing.

(Id. ¶ 18 & Ex. A § 19.2.)  Moreover, Section 20 provided as follows:

Franchisee represents and warrants . . . [f]or a period of two (2) years after the termination of this Agreement for any reason, which two-year period shall not begin to run until Franchisee commences to comply with all obligations stated in this section 20, Franchisee shall not . . . within a radius of ten (10) miles of Franchisee's former Center and ten (10) miles of any other Center in operation at the time of termination or any Center that has commenced operation during the two-year period, begin or engage in any business the same as, similar to or in competition with such Center, except for a business previously approved by AAMCO pursuant to section 8(e).

(Id. ¶ 19 & Ex. A § 20.)

Notwithstanding these provisions, Defendants have, according to Plaintiff, failed to remove the AAMCO name and trademark from the Center and cease all use of ATI's systems and AAMCO merchandising materials.  (Id.)  Moreover, Defendants have continued to operate a competing transmission repair business at the former Center location under the name and style "AAMCO Transmissions," thereby holding themselves out as an authorized ATI franchisee. (Id.)  In addition, Defendants maintain the telephone number that links to the former and current Yellow Page ads for "AAMCO Transmission."  (Id. ¶ 21.)  Finally, Defendants have neglected to

3

cure any of their monetary defaults.  (Id. ¶¶ 22-23.)

Plaintiff filed a Complaint in this Court on June 3, 2011, setting forth six causes of action against Defendants.  Count I alleges trademark infringement.  (Id. ¶¶ 24-33.)  Count II asserts a claim for breach of franchise agreement/specific performance.  (Id. ¶¶ 34-40.)   Count III alleges a claim of common law unfair competition.  (Id. ¶¶ 41-45.)  Count IV asserts breach of contract. (Id. ¶¶ 46-54.)  Count V seeks costs and attorneys' fees.  (Id. ¶¶ 55-59.)  Finally, Count VI sets forth a request for a declaratory judgment.  (Id. ¶¶ 60-66.)

Defendants responded with an Answer and Counterclaim on August 29, 2011.  In their Counterclaim Complaint, Defendants aver that prior to entering the Franchise Agreement, representatives of ATI had indicated that ATI had a "proven formula and system" for maintaining a successful franchise, that its Business Model included cost containment provisions for labor and parts, and that this model would allow Defendants to make a profit.  (Answer & Countercl. ¶¶ 86-91.)  Relying on these representations, Defendants entered into the Franchise Agreement and continued to use ATI's Business Model for three and a half years.  (Id. ¶¶ 92-93.) Ultimately, however, Defendants found that ATI's Business Model was only effective with respect to rebuilding transmissions, but was not profitable with respect to general automotive repairs, installing remanufactured transmissions, and/or installing used transmissions — a fact that ATI knew or should have known.  (Id. ¶¶ 94-99.)  The Counterclaim Complaint goes on to allege that pursuant to the Franchise Agreement, Defendants were required to participate in a local "ad pool" to share local advertising expenses — including television and print marketing — with franchisees in the designated market area.  (Id. ¶¶ 100-02.)  The costs for the "ad pool" are divided equally among the franchisees in the designated market area, but, in April 2011,

4

Defendants were unable to pay the local "ad pool" due to a lack of profitability resulting from the alleged deficiencies and ineffectiveness of the ATI Business Model. (<u>Id.</u> ¶¶ 103-05.) Due to the failure of Defendants to pay the "ad pool" costs, Plaintiff, without notice or warning, removed Defendants from its internet website and from its Center Locator, which allows customers to locate franchises on the ATI national website. (<u>Id.</u> ¶¶ 106-07.) These actions by Plaintiffs further reduced any income potential from Defendants, making it impossible to cure any financial deficiencies. (<u>Id.</u>)

Based on these events, Defendants put forth several counterclaims against Plaintiff ATI. First, they allege a cause of action for breach of the Franchise Agreement (Count I). (<u>Id.</u> ¶¶ 109-17.) Second, they assert that Plaintiff breached the implied covenant of good faith and fair dealing (Count II). (<u>Id.</u> ¶¶ 118-26.) Finally, they claim fraudulent misrepresentation. (Count III). (<u>Id.</u> ¶¶ 127-33.)

Prior to the Answer being filed, Plaintiff brought a Motion for Preliminary Injunction on July 21, 2011. Defendants responded on August 12, 2011, and, on October 5, 2011, the Court approved a stipulation between the parties resolving the injunction motion. Subsequently, on September 13, 2011, Plaintiff moved to dismiss Defendants' Counterclaims and, following an extension of time, Defendants responded on October 26, 2011. Plaintiff submitted a Reply Brief on November 2, 2011, making this Motion ripe for the Court's consideration.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); <u>see also</u> <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3d Cir. 2005). In <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544

(2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555.  Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id., 129 S. Ct. at 1949.  Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950.  Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.  A complaint alleges, but does not show, an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232-34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of

review have remained static.  Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations.  Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

### A.   The Fraud Counterclaim (Count III)

Defendants' fraud counterclaim alleges that ATI made certain representations regarding the profitability of its Business Model.  (Answer & Countercl. ¶ 128.)  Despite adhering to this Business Model, however, Defendants were never profitable, requiring them to broaden their scope of services to remain operational.  (Id. ¶¶ 129-30.)  Defendants now assert that they reasonably relied upon these representations, which both induced them to enter into the Franchise Agreement and induced them to follow ATI's Business Model practices subsequent to the execution of the Agreement.  (Id. ¶ 131.)  Ultimately, however, they contend that they never received the profits ATI promised.  (Id. ¶ 132.)

A parsing of these allegations reveals that Defendants' fraud claim essentially has two components: (1) fraud in the inducement to enter into the Franchise Agreement and (2) fraud in the performance of the Franchise Agreement.  Because these claims have separate legal analyses, the Court addresses them separately.

7

### 1.   **Fraud in the Inducement**

Under Pennsylvania law, the elements of fraud in the inducement are:

(1) a representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and

(6) the resulting injury was proximately caused by the reliance.

Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co., 700 F. Supp. 2d 720, 727 (W.D. Pa. 2010) (citing Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005)).  "Where prior fraudulent representations are alleged, the parol evidence rule bars such representations where the written agreement: (1) contains terms which directly deal with the subject matter of the alleged oral representation; and (2) represents the entire contract between the parties, particularly where the written agreement also contains an integration clause."  Atl. Pier Assoc., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 489 (E.D. Pa. 2009) (citing 1726 Cherry St. P'ship v. Bell Atl. Props., 653 A.2d 663, 666 (Pa. Super. Ct. 1995) (further citations omitted)).  Both the "same subject matter" component and the integration component must be satisfied before the parol evidence rule is used to bar prior representations. See Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004).  Should both components be satisfied, "parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract."  Id. at 437 n.26.

In the current case, both components are present.  First, the Franchise Agreement

8

expressly deals with the issue of profitability.  Section 24 of the Franchise Agreement, entitled

Risk of Operations, provides that:

> Franchisee acknowledges that there are uncertainties inherent in all business ventures.  Franchisee acknowledges that he has conducted a thorough and independent investigation and, based on that investigation, desires to enter into this Agreement and undertake the business of owning and operating an AAMCO Center. *Franchisee agrees and acknowledges that, except as specifically set forth in this Agreement, no representations or warranties, express or implied have been made to Franchisee*, either by AAMCO or anyone acting on its behalf or purporting to represent it, including, without limitation any such representations or warranties *relating to the prospects for successful operations, the level of business, sales or profits that Franchisee might reasonably expect, the desirability, profitability or expected traffic volume or profit of the Center* (whether or not AAMCO assisted Franchisee in the selection of the location of the Center), *the costs of equipping or the amount or type of equipment necessary or appropriate to the operation of the Center or as to the quality of any products or services to be sold by Franchisee to its customers.*  Franchisee acknowledges that all such factors are necessarily dependent upon variables beyond AAMCO's control, including without limitation, the ability, motivation and amount and quality of effort expended by Franchisee.

(Compl., Ex. A § 24 (emphasis added).)  Under this language, the Franchisee Agreement

explicitly disclaims any prior representation as to the potential profitability of operating an

AAMCO franchisee.  Moreover, nothing in the remainder of the Franchise Agreement implies

that Defendants' compliance with the AAMCO business model will guarantee them any

particular level of profitability.

Second, the Franchisee Agreement unequivocally represents the entire agreement

between these parties.  Section 29 of the Franchise Agreement, entitled "Entire Agreement,"

states:

> This Agreement contains the entire agreement of the parties, and supersedes, cancels, and revokes any and all other agreements between the parties relating to the subject matter of this Agreement.  *There are no representations, warranties, promises or inducements, either oral or written, except those contained in this Agreement.* Except as set forth in section 7.1, this Agreement may be modified only by an

9

agreement in writing signed by the party against whom enforcement of such modification is sought.

(Id. § 29 (emphasis added).)  Such a provision contains unambiguous, true integration language that operates to make the Franchise Agreement a fully integrated document.  See Quorum Health Res., Inc. v. Carbon-Schuylkill Cmty. Hosp., Inc., 49 F. Supp. 2d 430, 433 (E.D. Pa. 1999) (finding a document fully integrated where it had "an integration clause that states the written agreement sets forth in full the terms of the parties undertaking, and, thus, contains true integration language").

Defendants do not dispute these principles and, in fact, expressly agree that "a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations."  (Defs.' Resp. Mot. to Dismiss 7.)  Rather, they ask the Court to apply a narrow exception to the parol evidence rule created in Pennsylvania for "real estate inspection cases."  See LeDonne v. Kessler, 389 A.2d 1123, 1130-31 (Pa. 1978).  This exception, applicable to sales of residential real estate, requires the Court to balance "the extent of the party's knowledge of objectionable conditions derived from a reasonable inspection against the extent of the coverage of the contract's integration clause in order to determine whether that party could justifiably rely upon oral representations without insisting upon further contractual protection or the deletion of an overly broad integration clause."  Id. at 1130.  Defendants argue that, although the present case does not involve a real estate transaction, "the same reasoning would lead the Pennsylvania Supreme Court to allow an exception to the integration clause because the nature of consumer residential real estate transactions with respect [to] latent defects that are represented in a certain manner but one that due diligence might not adduce and the representations made about

10

ATI's business model are similar." (Defs.' Resp. Mot. to Dismiss 7.)  They reason that they could not have conducted any due diligence to investigate the profitability of ATI's business model because ATI controls this information, leaving Defendants with no "meaningful opportunity" to negotiate the inclusion of the "business model" representations into the franchise. (Id. at 9.)

Defendants' argument, however, is misplaced.  Although Defendants engage in a creative effort to fit this case into the exception, the Pennsylvania Supreme Court has expressly held that this "Real Estate Inspection" exception to the parol evidence rule must be strictly applied to cases involving the "sales and leases of real property where oral representations regarding a lack of physical defects in the property were made and the purchaser or lessee was not able to discover, through visual inspection, that the representations were false." HCB Contractors v. Liberty Place Hotel Assoc., 652 A.2d 1278, 1280 (Pa. 1995).  Subsequent federal cases have adhered to that limitation.  See Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 655 (W.D. Pa. 1999) (holding that fraud exception to parol evidence rule has "no applicability when residential real estate is not involved"); Falbo v. State Farm Life Ins. Co., No. Civ.A.96-5540, 1997 WL 116988, at *4 (E.D. Pa. Mar. 13, 1997) ("Under Pennsylvania law as it now stands, it appears that parol evidence is inadmissible to show fraud in the inducement of a contract."). Moreover, Defendants' argument that the alleged "defects" in the AAMCO business model were latent and could not be discovered is undermined by the Franchise Agreement.  In that contract, Defendants explicitly averred that they had conducted a "thorough" investigation of the risks of entering into the Agreement and franchise.  (Compl., Ex. A, ¶ 24.)  Indeed, prior to entering into the Franchisee Agreement, Defendants could have easily contacted other ATI franchisees and

researched whether the Business Model was in fact as profitable as represented by Plaintiff. The alleged false representations are simply not akin to latent defects in a property that could not be discovered through inspection.

In short, both prongs of the parol evidence test have been satisfied. As such, Defendants cannot maintain a fraud in the inducement claim based on Plaintiff's alleged misrepresentations about the profitability of their Business Model made prior to the execution of the Franchise Agreement. This Counterclaim shall therefore be dismissed.

### 2.      Fraud in the Performance

The other component of Defendants' fraud claim alleges that subsequent to entering into the Franchise Agreement, ATI told them their profits would improve if they followed the ATI Business Model. (Answer & Countercl. ¶ 88.) Plaintiff argues that this claim fails on two grounds: (1) it does not constitute actionable fraud, and (2) it is barred under the gist of the action doctrine. As the latter contention mandates dismissal of this Counterclaim, the Court focuses solely on that argument.

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious." Sunquest Info. Sys., 40 F. Supp. 2d at 651. To make this determination, the court must ascertain the source of the duties allegedly breached. Sunburst Paper, LLC v. Keating Fibre Int'l, No. Civ.A.06-3959, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006). The doctrine bars tort claims: (1) arising solely from a contract between the

parties; (2) where the duties allegedly breached were created and grounded in the contract itself;

(3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a

breach of contract claim or the success of which is wholly dependent on the terms of a contract.

eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002). "In other words,

if the duties in question are intertwined with contractual obligations, the claim sounds in

contract, but if the duties are collateral to the contract, the claim sounds in tort." Sunburst Paper,

2006 WL 3097771, at *2.

Pennsylvania jurisprudence has directly confronted the issue of whether the gist of the

action doctrine applies to a cause of action for fraud. The elements of a fraud claim under

Pennsylvania law include "a misrepresentation, an intent by the maker that the recipient be

induced to act, justifiable reliance by the recipient upon the misrepresentation, and damage to the

recipient as the proximate result." Olkowski v. Prudential Ins. Co. of Am., 584 F. Supp. 1140,

1141 (E.D. Pa. 1984). A claim for fraudulent inducement includes an additional element that the

misrepresentation was made with the specific intent to induce another to enter into a contract

when the person had no duty to enter into the contract. In re Allegheny Int'l, 954 F.2d 167, 178

(3d Cir. 1992). Under prevailing Pennsylvania cases, Pennsylvania law has "*not* carved out a

categorical exception for fraud, and [has] not held that the duty to avoid fraud is always a

qualitatively different duty imposed by society rather than by the contract itself." eToll, 811

A.2d at 19. Rather, the holdings turn on the question of whether the fraud concerned the

performance of contractual duties. Id. "If so, then the alleged fraud is generally held to be

merely collateral to a contract claim for breach of those duties. If not, then the gist of the action

would be the fraud, rather than any contractual relationship between the parties." Id.

13

Accordingly, the gist of the action doctrine generally bars fraud claims in cases where a defendant's alleged failure to perform its duty under the contract is transformed into a claim that this failure amounts to fraud.  Asbury Auto. Grp. LLC v. Chrysler Ins. Co., No. Civ.A.01-3319, 2002 WL 15925, at *3 (E.D. Pa. Jan. 7, 2002); see also Horizon Unlimited, Inc. v. Silva, No. Civ.A.97-7430, 1998 WL 88391, at *4-5 (E.D. Pa. Feb. 26, 1998) (holding that gist of the action doctrine barred fraud and negligent misrepresentation claims premised on allegedly false statements made in promotional literature about the product when the subsequent contract disclaimed any prior representations); Factory Mkt., Inc. v. Schuller, Inc., 987 F. Supp. 387, 394-95 (E.D. Pa. 1997) (finding that gist of the action doctrine barred fraud claims against roofer who agreed and repeatedly attempted to repair a chronically leaking roof, even though he knew from the outset that it was beyond repair, as the obligation to make the roof watertight was imposed by the contract, not in tort).

In the present case, Defendants' fraud in the performance claim alleges that it was required, by contract, to follow ATI's Business Model.  Specifically, Section 8(h) of the Franchisee Agreement mandated that the franchisee "operate the Center in accordance with the methods, policies and procedures, and techniques included in the Operator's Manual and other training manuals and materials, as modified and/or updated from time to time as determined by AAMCO in its sole discretion, or otherwise approved by AAMCO."  (Compl., Ex. A. § 8(h).)  Further, Section 6.1 enumerated the services to be rendered by AAMCO in order assist the success of the franchise.  (Id. § 6.1.)  To the extent Defendants now allege that this Agreement somehow guaranteed a certain level of profitability, and to the extent Defendants did not enjoy that level of profitability, the claim sounds entirely in contract, not tort.  As the gist of the action

doctrine bars fraud claims grounded on a defendant's alleged failure to perform its duty under a contract, the Court must dismiss this claim.

### B.    Breach of Contract Counterclaims (Count I)

Count I of Defendants' Counterclaim Complaint sets forth a cause of action for breach of contract.  A plaintiff asserting a breach of contract claim under Pennsylvania law must establish three elements: the existence of a contract; a breach of a duty imposed by the contract; and resultant damages.  Pennsy Supply, Inc. v. Am. Ash Recycling Corp., 895 A.2d 595, 600 (Pa. Super. Ct. 2006).  In the present case, Defendants put forth counterclaims for two alleged breaches of contract: (1) breach of the Franchise Agreement by removing Defendants from the national ATI website and Center Locator; and (2) breach of the Franchise Agreement by licensing two other franchisees within ten miles of Defendants.  The Court addresses each purported breach individually.

### 1.    Removal of Defendants from Website

Defendants' first breach of contract counterclaim asserts that ATI owed them a duty, under the Franchise Agreement, to ensure it promoted them as an authorized AAMCO Center. (Answer & Countercl. ¶ 110.)  ATI, however, allegedly breached that Agreement by removing Defendants from the national ATI website and Center Locator.  (Id. ¶ 111.)  As a result of this breach, Defendants claim to have suffered approximately $300,000 in operating losses since February 2008.  (Id. ¶ 112.)

This claim fails on several grounds.  First, Defendants fail to identify any provision of the Franchise Agreement which creates a duty on Plaintiff's part to maintain Defendants' Center on

15

the national website and Center Locator.  Indeed, their only reference to the Franchise Agreement

is Paragraph 6.1(j), which states that Plaintiff agreed to,

> *assist* in the design of advertising promoting the business of AAMCO franchisees
> and the services they sell; *and make available to Franchisee its experience, know
> how, guidance, and counseling* with respect to national, regional, and/or local
> advertising, and combinations thereof, including the selection of particular media and
> advertising content, as well as the choice of agencies for the purchase and use of
> these advertising techniques[.]

(Compl., Ex. A, § 6.1(j) (emphasis added).)  This provision clearly puts the burden of advertising

on the franchisee and only guarantees ATI's *assistance* with such advertising.  Noticeably absent

is any obligation on the part of Plaintiff to maintain a national website with Defendants' Center

on it or to include Defendants' Center on a Center Locator.  Indeed, quite to the contrary, the

Agreement expressly states that:

> Franchisee agrees that AAMCO may, from time to time, designate an AAMCO
> website for the purpose of advertising the AAMCO names and marks and services
> associated with the System as well as individual centers.  Franchisee acknowledges
> and agrees that all parts of the designated web site, including any web page(s)
> dedicated to his Center, are the property of AAMCO and that *AAMCO has the sole
> and exclusive right and authority to change or terminate the web site in total or in
> part, as AAMCO deems appropriate.*

(Id. § 11.3(b) (emphasis added).)  Without a showing of a contractual duty consistent with their

claim, Defendants have not adequately pled breach of that duty for purposes of Fed. R. Civ. P.

12(b)(6).

Moreover, even assuming *arguendo* that Defendants could establish Plaintiff's

contractual duty of advertising Defendants' Center on a national website, the Counterclaim

Complaint effectively concedes that Defendants breached their own obligations with respect to

16

advertising and promotion, thereby justifying Plaintiff's actions.  Defendants admit that Section 11.2(b) of the Franchisee Agreement created an ad pool to share local advertising expenses with the franchisees in the Designated Market Area, and that the costs were divided equally among the franchisees in that Designated Market Area.  (Answer & Countercl. ¶¶ 101, 103.)  Defendants go on to concede that they were unable to pay the local "ad pool" for April 2011 and, as a direct result, were removed from the web site and Center Locator.  (Id. ¶¶ 104, 106-07.)  Defendants now attempt to reason that ATI was only entitled to pursue the monies owed, and not to "arbitrarily stop its advertising efforts on behalf of the Defendants."  (Defs.' Resp. Mot. to Dismiss 10-11.)  Section 11.2(e) of the Agreement, however, indicates that a franchisee acknowledges both the benefits conferred upon it by the ad pool and its responsibility for the costs of that pool.  (Compl., Ex. A, § 11.2(e).)  It further states that if a franchisee fails to promptly pay the amount due, either AAMCO or the local advertising group can seek enforcement of that obligation, without specifying the precise or exclusive means of that enforcement.  (Id.)  Given Defendants' admitted failure to pay its share of the ad pool, they cannot plausibly bring a breach of contract claim based on Plaintiff's refusal to let them continue receive the ad pool's benefits.  Accordingly, the Court dismisses this claim.

## 2.    Allowing Other Franchises to Exist in Proximity to Defendants

The second part of Defendants' breach of contract Counterclaim asserts that, "[p]ursuant to the Franchise Agreement, no other franchise was to be [in] an area of 10 miles within [Defendants'] business location."  (Answer & Countercl. ¶ 113.)  Yet, contrary to that provision, "ATI specifically licensed two other franchisees within 10 miles of [Defendants]," one within four mile and one within ten miles.  (Id. ¶ 114.)  Defendants conclude that this was a material

17

breach that resulted in damage to Defendants' Center.

Again, however, Defendants argument contravenes the express terms of the Franchise Agreement. Section 1.2 of the Franchise Agreement states, in no uncertain terms, that:

> AAMCO expressly reserves the right to grant additional franchises or establish other Centers in the same Statistical Area. The number of Centers will be based upon then current motor vehicle registrations and the marketing program of AAMCO, and shall be limited to a maximum of one Center for each 100,000 motor vehicle registrations. *Notwithstanding this motor vehicle registration limit, Franchisee agrees that he does not have and is not being granted a protected trading area, specifically without limitation, in regard to the placement of other AAMCO Centers.*

(Compl., Ex. A, ¶ 1.2(a) (emphasis added).)

In an effort to sidestep this unequivocal language, Defendants argue, in their Response to the Motion to Dismiss, that "[w]hile ATI may not have granted a protective trading area, ATI specifically contracted that 'the number of Centers . . . shall be limited to a maximum of one Center for each 100,000 motor vehicle registrations' . . . The placement of three franchises in a ten mile radius breaches section 1.2(a) of [the Agreement]." (Defs.' Resp. Mot to Dismiss 11.) Assuming, however, that § 1.2(a) of the Agreement somehow created a duty on Plaintiff's part to not place franchises that exceed the maximum of one Center for each 100,000 motor vehicle registrations, Defendants' Counterclaim Complaint never alleges that the number of registrations was insufficient to permit the establishment of two other franchises within ten miles of Defendants' Center. Rather, Defendant relies only on the proximity of these other franchises. Such allegations are patently insufficient to plead a breach of contract under Rule 12(b)(6). Thus, this portion of the breach of contract counterclaim is also dismissed.

18

C.    **Good Faith and Fair Dealing (Count II)**

The last of Defendants' three counterclaims asserts that prior to Defendants being

removed from ATI's website and Center Locator, they substantially complied with the Franchise

Agreement in all respects.  (Answer & Countercl. ¶ 121.)  Nonetheless, Plaintiff terminated the

Franchise Agreement without good cause and allowed two or more AAMCO franchises to

operate within ten miles of one another.  (Id. ¶¶ 122-23.)  Defendants go on to allege that "ATI

favored those franchisees . . . and placed impediments to [Defendants'] business and treated

Defendant differently . . ."  (Id. ¶ 124.)  As a result, Plaintiff breached its covenant of good faith

and fair dealing under Pennsylvania law, causing Defendants to suffer harm.  (Id. ¶¶ 120, 125.)

"[U]nder Pennsylvania law, every contract does not imply a duty of good faith."  Parkway

Garage, Inc. v. City of Phila., 5 F.3d 685, 701 (3d Cir. 1993), abrogated on other grounds by,

United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa., 316 F.3d 392 (3d Cir. 2003);

Wardlaw v. City of Phila., No. Civ.A.09-3981, 2011 WL 1044936, at *8-9 (E.D. Pa. Mar. 21,

2011) (citing with approval Parkway's holding as to the duty of good faith).  Although the

Restatement (Second) of Contracts § 205 acknowledges an obligation of good faith in the

performance and enforcement of a contract, "[i]n practice . . . the courts have recognized an

independent cause of action for breach of a duty of good faith and fair dealing only in very

limited circumstances," and in contracts involving special relationships between the parties.

Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000); Hopkins v.

GNC Franchising, Inc., No. Civ.A.05-1510, 2006 WL 2266253, at *4 (W.D. Pa. Jan. 13, 2006).

"In franchise relationships, the Supreme Court of Pennsylvania has held that although a

19

franchisor has a duty to act in good faith and with commercial reasonableness when terminating a franchise agreement, the court would not recognize an implied duty of good faith where the contract contained express provisions authorizing the termination of the franchise without good cause." Id. (quoting Atl. Richfield Co. v. Razumic, 390 A.2d 736, 742 (Pa. 1978)). Moreover, the duty of good faith and fair dealing in franchise relationships is "applicable only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee." Witmer v. Exxon Corp., 434 A.2d 1222, 1227 (Pa. 1981). Although the duty may apply to either direct or indirect termination of the franchise, neither the Pennsylvania Supreme Court nor federal courts interpreting Pennsylvania law have ever extended the duty to other conduct occurring in the course of the franchise relationship. Id.; Vino 100 LLC v. Smoke of the Water, LLC, No. Civ.A.09-4983, 2011 WL 2604338, at *5 (E.D. Pa. July 1, 2011); GNC Franchising LLC v. Khan, Nos. Civ.A.05-1391, 06-283, 2008 WL 612749, at *7-8 (W.D. Pa. Mar. 3, 2008); GNC Franchising v. Farid, No. Civ.A.05-1741, 2006 WL 1878925, at *4-5 (W.D. Pa. July 6, 2006); Bishop v. GNC Franchising, LLC, 403 F. Supp. 2d 411, 419 (W.D. Pa. 2005), aff'd, 248 Fed. Appx. 298 (3d Cir. 2007), but see AAMCO Transmissions, Inc. v. Harris, 759 F. Supp. 1141, 1148-49 (E.D. Pa. 1991) (holding that it is unlikely that Pennsylvania courts, when presented with the issue, will limit the scope of the covenant of good faith and faith and fair dealing to situations of franchise termination). Absent any precedent from the Pennsylvania Supreme Court or Third Circuit expanding the scope of this duty, and in light of the great weight of authority adhering to this limitation, the Court declines to find that the duty of good faith and fair dealing in the context of franchises extends to any conduct beyond the actual termination of the relationship. See Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp., 273 F.3d

536, 541 (3d Cir. 2001) ("It is not the role of a federal court to expand or narrow state law in ways not foreshadowed by state precedent.").

Defendants' good faith claim does not allege actual termination.  Nor does it suggest that Plaintiff's removal of Defendant from ATI's website and allowance of other franchises in the same trading area was a bad faith pretext to cause them to go out of business.  Rather, it only challenges Plaintiff's conduct in the course of performing the Franchise Agreement.  Because the duty of good faith does not cover such conduct, this counterclaim must be dismissed.

Moreover, even if the Court were to extend the implied covenant of good faith to these actions, it is well-established that such a covenant of good faith cannot modify or override the express terms of a contract.  Bishop v. GNC Franchising, 248 Fed. Appx. 298, 300 (3d Cir. 2007).  The Pennsylvania Supreme Court "articulated the standard of good faith and commercial reasonableness for the purpose of protecting a franchisee's 'reasonable expectations' in dealing with his franchisor."  Witmer v. Exxon Corp., 434 A.2d 1222, 1227 (Pa. 1981) (quotation omitted).  This duty of good faith "serves the valuable purpose of defining contractual relationships which have been left unexpressed by the parties."  Id.  By the same token, it is inapplicable where the contract or agreement expressly covers the complained of conduct, and it may not be used to override an express contractual term.  Id.; Northview Motors, 227 F.3d at 91.

In the present case, Defendants' good faith argument attempts to expand this obligation to modify the Agreement's clear terms.  For example, Defendants contend that "pursuant to the overall terms of the contract, the Plaintiff had a duty in good faith to advertise the Defendants center on its website," and that "[b]y removing the Defendants from its website arbitrarily, the

21

Plaintiff breached its duty of good faith." (Defs.' Resp. Mot. to Dismiss 12.) As set forth in detail above, however, the Franchise Agreement placed the burden of advertisement and promotion on Defendants and, to the extent Defendants wished to participate in any nationally-run advertising, they were obligated to pay their portion of the ad pool — an obligation they admittedly did not meet. Moreover, Defendants contend that "the placement of three franchises in a ten mile radius breaches section 1.2(a) of [the] Complaint because of the motor vehicle registration limit." (Id. at 12.) The Franchise Agreement, however, expressly dealt with this argument by stating that "[n]otwithstanding this motor vehicle registration limit, Franchisee agrees that he does not have and is not being granted a protected trading area, specifically without limitation, in regard to the placement of other AAMCO Centers." (Compl., Ex. A, ¶ 1.2(a).) The duty of good faith and fair dealing may not now be used to modify these unambiguous provisions.

## IV.   CONCLUSION

In light of the foregoing, the Court finds no basis on which Defendants may maintain their Counterclaim Complaint against Plaintiff. Defendants' fraud claims are either barred by the parol evidence rule or are subsumed by the gist of the action doctrine. Defendants' breach of contract claims fail to properly plead the essential element of a duty on the part of Plaintiff that has been breached. Finally, Defendants' breach of the duty of good faith and fair dealing claim improperly attempts to both expand the scope of this covenant and to use it to amend the express terms of the contract. Finding that Defendants have failed to state any plausible claim for relief, the Court grants the Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) in its entirety and dismisses the Counterclaim Complaint.